UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
DARRYL T. SCOTT,                          )
                                          )
            Plaintiff,                    )
                                          )          Civil Action No. 10-11348-GAO
v.                                        )
                                          )
THOMAS DICKHAUT, OSVALDO VIDAL,           )
and ANTHONY MENDONSA,                     )
                                          )
            Defendants.                   )
_____)

**REPORT AND RECOMMENDATION ON DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S**
**CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**
[Docket Nos. 33, 48]

May 29, 2013

Boal, M.J.

Pro se Plaintiff Darryl T. Scott ("Scott") has sued Defendants Thomas Dickhaut

(Superintendent of Souza Baranowski Correctional Center), Osvaldo Vidal (Deputy

Superintendent of Operations), and Anthony Mendonsa (Deputy Superintendent of

Classification) in their individual and official capacities for alleged violations of Scott's Eighth

Amendment rights pursuant to 42 U.S.C. § 1983. Docket No. 15-1. Defendants have filed a

motion for summary judgment. Docket No. 33. The Court heard oral argument on the motion

on January 23, 2013. On February 7, 2013, Scott filed a cross-motion for partial summary

judgment on Defendants' liability. Docket No. 48. For the reasons discussed below, this Court

recommends that the District Court grant the Defendants' motion and deny Scott's motion.

1

I.      **FACTUAL AND PROCEDURAL HISTORY**[1]

On February 8, 2012, Scott filed an amended complaint against Defendants in their individual and official capacities alleging that they violated Section 1983 and his Eighth Amendment rights by: (1) instituting a policy and practice of double bunking prisoners with known enemies and allowing them to fight, and (2) failing to protect him from harm from other inmates.  AC ¶¶ 4-5, 8, 12.[2]  Defendants answered the amended complaint on March 30, 2012.  Docket No. 28.  The parties thereafter engaged in discovery.

Defendants filed the instant motion on October 10, 2012.  Pursuant to the Court's scheduling order, Scott was to file a response by November 13, 2012.  Docket No. 31.  Having received no opposition, on November 29, 2012, the Court ordered Scott to file his opposition by December 21, 2012 or the motion would be considered unopposed.  Docket No. 36.[3]  On January 23, 2012, the Court heard oral argument on the motion.  Docket No. 43.  At that time, the Court gave Scott until February 6, 2013 to file his opposition to the motion for summary

---

[1] The facts are derived from the exhibits attached to the amended complaint (Docket No. 15-1) ("Pl. Ex. _"); Defendants' Statement of Material Facts (Docket No. 33) ("DF _"); the exhibits and affidavits attached to the Defendants' present motion (Docket No. 34) ("Def. Ex. _"); and the exhibits attached to the Defendants' January 31, 2013 Status Report (Docket No. 46) ("Def. SR Ex. _").

[2] "AC ¶ _" refers to Scott's amended complaint, which he filed on July 5, 2011 as an exhibit to his motion to amend his initial complaint.  Docket No. 15.  Noting that Scott had leave as of right to file the amended complaint, this Court granted the motion on February 8, 2012. Docket No. 21.

[3] On November 5, 2012, Scott filed a motion for an extension of time to file an opposition, which was not docketed until December 10, 2012.  Docket No. 38.  In light of the Court's order giving Scott until December 21, 2012 to file his opposition, the Court granted Scott's motion.  Docket No. 39.

judgment.[4]  Id.

On February 7, 2013, Scott filed his opposition, which included a cross-motion for partial summary judgment on Defendants' liability.  Docket No.  48.  Defendants filed a reply on March 11, 2013.  Docket No. 52.

A.      The Parties

At all times relevant to this matter, Scott was an inmate at Souza Baranowski Correctional Center ("SBCC") in Shirley, Massachusetts.  DF 1; Affidavit of Osvaldo Vidal ("Vidal Affidavit"), ¶ 3, Def. Ex. 1.  Scott alleges that he was known throughout the prison system as a "snitch" because he testified before a grand jury about an assault against him.  AC ¶ 1.[5]  At times relevant to the complaint, Defendant Thomas Dickhaut was the Superintendent of SBCC[6] and Anthony Mendonsa was the Deputy Superintendent of Classification and Treatment at SBCC.[7]  Docket No. 34, p. 1.  Mendonsa was responsible for identifying the security and programmatic needs of inmates and recommending, via the classification process, the

---

[4]  At oral argument, Scott stated that he was having problems accessing the legal resources at SBCC, which prevented him from filing an opposition.  The Court ordered Defendants to file a status report regarding the availability of legal resources, which they did on January 25, 2013.  Docket No. 44.  The status report detailed the availability of legal resources and Scott's attempts to access such resources.  Id.  In any event, Scott filed an opposition to the motion for summary judgment, replete with legal citations.  Accordingly, the Court does not view Scott's access to legal materials as an issue at this time.

[5]  Although the Court recognizes that a non-moving party cannot rely upon allegations in the complaint to contest a motion for summary judgment, it cites the amended complaint in this report and recommendation only to explain the nature of Scott's claim.  See De La Vega v. The San Juan Star, Inc., 377 F.3d 111, 118 n. 9 (1st Cir. 2004).

[6]  Defendant Dickhaut is now Acting Assistant Deputy Commissioner of the Northern Sector.  Docket No. 34, p. 1 n.1.

[7]  Defendant Mendonsa left the Department of Corrections on June 20, 2012.  Docket No. 34, p. 2 n. 2.

appropriate security level in which inmates should be placed.  Affidavit of Anthony Mendonsa ("Mendonsa Affidavit") ¶ 4, Def. Ex. 2.  He was also responsible for supervising the officers in charge of cellblock operations in the general population at SBCC, as well as for overseeing cell assignments throughout the facility.  <u>Id.</u>  Assignment Officer Sergeant Ronald Raymond ("Sergeant Raymond"), who is responsible for conducting inmate cell and work assignments at SBCC, reported directly to Mendonsa.  <u>Id.</u>  Defendant Osvaldo Vidal is the Deputy Superintendent of Operations at SBCC.  <u>Id.</u>  Vidal's duties include overseeing the security and operations of SBCC.  Vidal Affidavit, ¶ 1.

B.     <u>SBCC</u>

SBCC has a 1,638 bed capacity and has inmate housing on three floors.  DF 2; Ronald Raymond Affidavit ("Raymond Affidavit"), ¶ 2, Def. Ex. 3.  SBCC has a North and South side; each side has eight housing units on the first two floors and specialized units on the third floor. <u>Id.</u>  These specialized units include two Special Management Units ("SMU") and one Security Treatment Program.  <u>Id.</u>

On May 3, 2009, SBCC became the sole maximum security prison in Massachusetts.  DF 2; Mendonsa Affidavit, ¶5.  At the time Defendants filed the instant motion, SBCC  had approximately 1,285 inmates, with approximately 45% of its general population double bunked. <u>Id.</u>  In his amended complaint, Scott alleges that there is a policy at SBCC to double bunk known enemies and/or to allow known enemies to be placed in cells together and allowed to fight.  AC ¶ 5; DF 18-19; Vidal Affidavit, ¶¶ 17-18.

C.      Conflict Policy

Of the approximately 1,285 inmates at SBCC, the Inner Perimeter Security Unit ("IPS")[8] reports that there are 1,035 active Inmate-to-Inmate Conflicts.  DF 2.  The Massachusetts Department of Correction ("Department" or "DOC") has a policy that provides a mechanism to document verified conflicts.  DF 3; Vidal Affidavit, ¶ 5; Def. SR Exs. K, L, 103 DOC 426.00.[9] The policy defines a conflict as "a relationship or situation between inmates or between inmates or staff members which may likely result in placing them or other inmates or staff members in danger of harm or personal injury; as such, this relationship or situation may pose a threat to the security of the institution."  DF 4; Vidal Affidavit, ¶ 6; Def. SR Exs. K-L, 103 DOC 426.01.

Inmates are screened for conflicts with other inmates upon their arrival into the Department's custody and also upon transfer to another correctional facility.  DF 5; Vidal Affidavit, ¶ 7; Def. SR Exs. K-L, 103 DOC 426.03; Def. SR Exs. E-F, SBCC Institutional Procedures at A7, Attachment B-1; Def. SR Exs. A-B, 103 DOC 401.01(2)(A).  During the Admissions/Booking process, inmates are interviewed by a Correctional Program Officer ("CPO") and can inform the CPO of any relationship or situation where the potential for harm or personal injury exists.  Id.  After being booked, an inmate goes through an orientation process in an Orientation Housing Unit and receives an Inmate Orientation Handbook that also informs the

---

[8]  The function of the IPS unit at a state prison facility is to investigate incidents, accidents and crimes, to monitor the prison, its staff and inmates, and to detect, prevent and or respond to the commission of crimes or any activities (i.e., drugs, gangs, escape) which inherently compromise the security of a penal facility and/or the community.  Docket No. 34, p. 2 n. 4.

[9]  Defendants originally attached versions of DOC policies that were effective in 2012. At the Court's request, Defendants supplemented the record with versions of the policies that were in effect at the time of Scott's alleged assaults.  See Docket No. 46, attaching exhibits A-L.

inmate regarding how to report a conflict.  DF 6; Mendonsa Affidavit, ¶¶ 6, 16.  An inmate may

also tell any staff member of a conflict or that he is in fear for his safety.  Mendonsa Affidavit, ¶

7; Vidal Affidavit, ¶ 9; Def. SR Exs. K-L, 103 DOC 426.03.  In addition, Sergeant Raymond

checks for any active inmate conflicts prior to assigning any inmate into a new cell or housing

unit.  DF 2, 7, 8; Raymond Affidavit, ¶ 4.

Scott participated in the Inmate Orientation process on two occasions before the

altercations at issue in this action.  DF 7; Mendonsa Affidavit, ¶¶ 9-10.

> D.     Incident Chronology

Scott claims that he was involved in altercations with fellow inmates on September 21,

2009, December 6, 2009, and March 26, 2010.  AC ¶¶ 7-8.  Although Defendants address Scott's

claims regarding the September 21, 2009 and March 26, 2010 incidents, they deny that an

altercation occurred on December 6, 2009 and instead provide facts regarding an incident that

occurred on November 29, 2009.  Answer, ¶ 7, Docket No. 28; DF 13.

> 1.     September 21, 2009

On September 21, 2009, Scott was moved from SMU to general population and placed in

the M2 housing unit.  DF 9; Raymond Affidavit, ¶ 7; Def. Ex. 3-E.  Scott had no documented

enemies or active inmate conflicts in the M2 housing unit at that time.  DF 9; See Raymond

Affidavit, ¶ 7.  That same day and while in the M2 housing unit, Scott was involved in a physical

altercation with another inmate, Emanuel Smith ("Smith").  DF 10; Vidal Affidavit, ¶ 10; Def.

Ex. 1-D.  Scott and Smith were not cell mates.  Raymond Affidavit, ¶ 8.  Scott alleges that during

the altercation, officers locked him in the cell with his assailant, who outweighed him by 60-75

pounds, in order to contain the fight.  AC ¶ 10.

Smith was not a documented enemy of Scott's prior to the September 21, 2009 altercation, nor had Scott identified him as an enemy or as a person with whom he had a conflict.  DF 10, 17; Vidal Affidavit, ¶¶ 10, 16; Raymond Affidavit, ¶ 8.  Following the altercation, both inmates were interviewed to determine if a conflict existed. Vidal Affidavit, ¶ 10; Def. Ex. 1-E.  An Inmate-to-Inmate Conflict Form was then completed, and the "conflict" between Scott and Smith was approved.  DF 10; Id. ¶ 10; Def. Ex. 1-E.

Scott alleges that a "green light" or "hit" was put out on him whereby anyone associated with his enemies was to attack Scott "on sight."  AC ¶ 7.  Scott alleges that he notified IPS about the hit but was informed "there was nothing they could do."  Id.  Defendants assert that on or about October 1, 2009, Scott wrote a letter stating that he had been informed that he would be assaulted when he reentered general population from SMU.  DF 11; Vidal Affidavit, ¶ 11; Def. Ex. 1-F.  The letter did not identify any specific enemy or any individual with whom he had a conflict.  Id.  Scott concluded the letter by requesting to be placed in the P2 unit, stating that he would be "incident free" if he were housed in P2.  Id.

2.      November 29, 2009

On October 30, 2009, Scott was moved from the SMU to the H2 housing unit.  DF 12; Vidal Affidavit, ¶ 12; Def. Ex. 1-G.  On November 5, 2009, Scott was moved from the H2 housing unit to the P2 housing unit.  Id.; Raymond Affidavit, ¶ 9.  There were no documented enemies or active conflicts for Scott in the P2 housing unit at that time.  Id.; Raymond Affidavit, ¶ 9.

On November 29, 2009, while in the P2 housing unit, Scott was involved in a physical altercation with another inmate, Miguel Diaz ("Diaz"). DF 13; Vidal Affidavit, ¶ 13; Raymond

Affidavit ¶ 10; Def. Ex. 1-H.  Scott and Diaz were not cell mates.  Raymond Affidavit, ¶ 10. Scott

had not identified Diaz as an enemy or as a person with whom he had a conflict.  DF 17; Vidal

Affidavit, ¶¶ 13, 16.  Following the altercation, both inmates were interviewed to determine if a

conflict existed.  Id., ¶ 13.  An Inmate-to-Inmate Conflict Form was then completed, and the

"conflict" between Scott and Diaz was approved.  Id.; Def. Ex. 1-I.

> 3.     December 6, 2009

Scott further alleges that an "enemy" assaulted him while in the P2 housing unit,  causing

massive trauma to his left eye and resulting in plastic surgery.  AC ¶ 7.  On December 14, 2009,

Scott's appellate attorney sent a letter to Defendant Dickhaut stating that Scott had contacted him

regarding an incident that injured his tear duct and that Scott was afraid to leave the infirmary and

return to the general population for fear of future altercations.  AC, Ex. C.

However, on or about December 21, 2009, Scott wrote a letter "to address a grave

miscommunication" about his placement.  DF 14; Vidal Affidavit, ¶ 14; Def. Ex. 1-J.   In his

letter, he stated that he did not want to be housed in the SMU and that he would "gladly go to

population."  Id.  Scott wrote that he had been told by a caseworker that he was being kept in

SMU because "the administration thinks I want to be here.  This is absolutely incorrect."  Id.

Scott concluded the letter by requesting to "be sent back to population immediately."  Id.

> 4.     March 26, 2010

On March 3, 2010, Scott was placed in general population in the H2 housing unit at

SBCC.  DF 15; Raymond Affidavit, ¶ 11; Def. Ex. 3-E.  There were no documented enemies or

active conflicts for Scott in the H2 housing unit at that time.  DF 15; Raymond Affidavit, ¶ 11.

On March 26, 2010, while housed in the H2 housing unit, Scott was involved in a physical

altercation with another inmate, Jurrell Laronal ("Laronal").  DF 16; Vidal Affidavit, ¶ 15; Raymond Affidavit,¶ 12 and Def. Ex. 1-K.  Scott and Laronal were not cell mates.  Raymond Affidavit, ¶ 12.  Scott had not identified Laronal as an enemy or as a person with whom he had a conflict.  DF 17; Vidal Affidavit, ¶¶ 15, 16; Raymond Affidavit ¶ 12.  Following the altercation, both inmates were interviewed to determine if a conflict existed.  Id., ¶ 15; Def. Ex. 1-B.  An Inmate-to-Inmate Conflict Form was then completed, and the "conflict" between Scott and Laronal was approved. Id.; Def. Ex. 1-L.

## II.     ANALYSIS

Defendants contend that they are entitled to summary judgment because Scott: (1) cannot assert claims for money damages against Defendants in their official capacities; (2) has not alleged any facts connecting Defendants with Scott's assaults; and (3) has not created a genuine issue of material fact that Defendants were deliberately indifferent to his safety.  Docket No. 34, p. 7-12.  Defendants also argue that they are entitled to qualified immunity.  Id. at p. 12-15.  Scott, in turn, argues that injunctive relief is appropriate against Defendants in their official capacities, and that the uncontroverted facts demonstrate that Defendants were deliberately indifferent to his safety.  Pl. Opp. p. 2, 7-11.[10]

### A.     Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could

---

[10] "Pl. Opp." refers to Scott's Opposition to Defendants' Motion for Summary Judgment, Cross Motion for Partial Summary Judgment, & Memorandum of Law in Support.  Docket No. 48.

resolve the point in the favor of the non-moving party." <u>Sanchez v. Alvarado</u>, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted).  A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." <u>Id.</u> (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. <u>See id.</u> at 324.  "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial. <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir. 1993) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).  Where the plaintiff is proceeding <u>pro se</u>, the court construes his allegations liberally.  <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Ayala Serrano v. Gonzalez</u>, 909 F.2d 8, 15 (1st Cir. 1991).  A court, however, will not "conjure up unpled allegations" to state an actionable claim. <u>McDonald v. Hall</u>, 610 F.2d 16, 19 (1st Cir. 1979).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment <u>per se</u>." <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996) (internal citations omitted).  "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Id.</u>  "Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." <u>Estate of Hevia v. Portrio Corp.</u>, 602 F.3d 34, 40 (1st Cir. 2010) (citing <u>Blackie v. Maine</u>, 75 F.3d 716, 721 (1st Cir. 1996) ("Barring special circumstances, the nisi prius court must consider each motion separately,

drawing inferences against each movant in turn.")).

Pursuant to Local Rule 56.1, "a party opposing a motion for summary judgment must include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." LR, D. Mass. 56.1. In addition, copies of all referenced documentation should be filed as exhibits to the opposition. Id. Uncontroverted statements of fact in the LR. 56.1 statement comprise part of the summary judgment record. See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (plaintiff's failure to contest facts in LR. 56.1 statement caused fact to be admitted on summary judgment).

Pro se status does not insulate a party from complying with procedural and substantive law. Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997). Courts have frequently grappled with the tension between evenly enforcing the rules and working an injustice, especially in the summary judgment context. See, e.g., Szillery v. Career Systems Development Corp., No. 08-62, 2008 WL 2789492, at *2 (D. Me. July 17, 2008). However, courts have not typically freed pro se plaintiffs from the pleading burden set forth in Rule 56. Rollins v. Magnusson, No. 03-82, 2004 WL 3007090, at *3-4 (D. Me. December 28, 2004) (granting summary judgment against pro se defendant where response did not contain admissible evidence); Brennan v. Town of South Kingston, No. 10-186, 2011 WL 1898248, at *5 (D.R.I. April 14, 2011) (same); Bartlett v. American Power Conversion Corp., No. 05-084, 2006 WL 2709404, at *2 n. 1 (D.R.I. September 20, 2006) (same). Nevertheless, even if the pro se plaintiff fails to respond to the statement of material facts, a court is still required to inquire as to whether the moving party has met its burden. Cordero-Soto v. Island Fin., Inc., 418 F.3d 114, 118 (1st Cir. 2005).

Here, Scott has not filed a concise statement of undisputed material facts or otherwise disputed those offered by Defendants. Still, although the facts are uncontested, this court must view the record in the light most favorable to Scott for purposes of deciding the Defendants' motion. See D & H Therapy Associates, LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011). In deciding Scott's cross-motion, the Court must view the record in the light most favorable to Defendants. See id.

B.      42 U.S.C. § 1983

Section 1983 is a vehicle through which individuals may sue certain persons acting under the color of state law for deprivation of federally assured rights. Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008). Specifically, Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

42 U.S.C. § 1983. Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-4 (1989).

"A claim under Section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). For purposes of the Defendants' motion, there is no dispute that the Defendants were acting under color of state law. However, Defendants contend that Scott has failed to create a genuine issue of material fact that they deprived him of any constitutional rights.

12

     1.     <u>Claim Against Defendants In Their Official Capacities</u>

Scott has sued the Defendants in both their individual and official capacities.  AC ¶¶ 2-4.

However, a state official acting in his official capacity cannot be sued for damages in a Section

1983 action.  <u>Wang v. New Hampshire Board of Registration in Medicine</u>, 55 F.3d 698, 700 (1st

Cir. 1995); <u>Rafferty v. Cranston Pub. Sch. Comm.</u>, 315 F.3d 21, 28 (1st Cir. 2002).  Therefore,

Scott cannot pursue money damages against Defendants in their official capacities for his Section

1983 claims and those claims should be dismissed.[11]

Scott argues that a claim for injunctive relief is appropriate against individuals in their

official capacity under Section 1983.  Pl. Opp., p. 2; <u>see</u> <u>also</u> <u>Asociacion De Subscripcion</u>

<u>Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza</u>, 484 F.3d 1, 24 (1st Cir.

2007) (citing <u>Ex Parte Young</u>, 209 U.S. 123, 155 (1908)).  However, the Amended Complaint

does not seek any specific injunctive relief.  Aside from money damages, it seeks "any other relief

this court deems just and equitable."  AC, VI, C.  This claim is simply not of the type that would

allow a Section 1983 suit against individuals in their official capacity to survive.

     2.     <u>Claim Against Defendants In Their Individual Capacities</u>

Construing Scott's pleadings liberally, the Court reads his amended complaint as asserting

a claim against Defendants both as individuals, and, because of the nature of each Defendant's

office, in their supervisory capacities.  In either context, however, the analysis is the same.

"Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each

---

[11]  To the extent that Scott intended to sue the Department of Corrections for money
damages, such claims must also be dismissed, as the Department of Corrections is not a "person"
within the meaning of 42 U.S.C. § 1983.  <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71
(1989).  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 120 (1984).

Government-official defendant, through the official's own individual actions, has violated the

Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). "Absent vicarious liability, each

Government official, his or her title notwithstanding, is only liable for his or her own

misconduct." Id. at 677. Put another way, "[a]bsent evidence of participation, concerted action,

or at least culpable knowledge, one officer cannot be held jointly liable under section 1983 for

another officer's [unconstitutional conduct]." Adams v. Cousins, No. 06-40017, 2009 U.S. Dist.

LEXIS 55050, at * 23 (D. Mass. March 31, 2009) (quoting Calvi v. Knox County, 470 F.3d 422,

429 (1st Cir. 2006)).

Scott's allegations regarding Defendants in their individual capacity are that they:

(1) instituted a policy and practice of double bunking prisoners with known enemies and allowing

them to fight, AC ¶¶ 4-5, 12; and (2) failed to protect him from harm from other inmates. AC ¶¶

8, 12.

a.      Eighth Amendment Claim

A prison official's deliberate indifference to a substantial risk of harm to an inmate

violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 828 (1994). Although not

every injury a prisoner suffers at the hands of another prisoner is actionable, prison officials must

take reasonable measures to guarantee an inmate's safety from attacks by other inmates. Id. at

833-4. "It is not, however, every injury suffered by one prisoner at the hands of another that

translates into constitutional liability for prison officials responsible for the victim's safety." Id.

at 834.

To establish an Eighth Amendment claim for a failure to protect, a plaintiff must show

that: (1) objectively, the deprivation alleged is sufficiently serious, i.e. that the conditions of

14

incarceration pose a substantial risk of serious harm; and (2) subjectively, that the defendant was deliberately indifferent to the plaintiff's health or safety. Id. at 834. A prison official may be liable for acting with deliberate indifference only if the official "knows of and disregards an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Therefore, in order to establish deliberate indifference, a plaintiff must show: "(1) the defendant knew of (2) a substantial risk (3) of serious harm and (4) disregarded that risk." Calderon-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002).

The Court will address each of Scott's claims in turn.

b.    Double Bunking Policy

Scott alleges, and Defendants dispute, that Defendants instituted a policy and practice of double bunking prisoners with enemies and allowing them to fight.[12] AC ¶¶ 4-5, 12. Scott has not presented any evidence that such a policy exists, nor has he created a genuine issue of material fact that the alleged double bunking policy posed a substantial risk of serious harm. Although it is true that the First Circuit has stated that "in rare cases" double bunking might amount to an unlawful practice "when combined with other adverse conditions," see Cote v. Murphy, 152 Fed. Appx. 6 (1st Cir. 2005), Scott has not presented any evidence of adverse

---

[12]   In his Amended Complaint, Scott alleges that the double bunking policy violates Mass. Gen. Laws c. 127 § 22, which states that two prisoners shall not be allowed to occupy the same room "unless the crowded state of the institution so requires." Mass. Gen. Law c. 127 § 22. However, this statute does not provide for a private cause of action, nor has Scott provided any evidence of a legislative intent to infer such a cause of action. See Cryer v. Spencer, No. 11-10654, 2012 U.S. Dist. LEXIS 34702, at *18-20 (D. Mass. Mar. 15, 2012) (dismissing claim under Mass. Gen. Law c. 127 § 22 for lack of standing to pursue private right of action). Accordingly, to the extent that Scott seeks to assert a claim under this statute, the Court recommends its dismissal.

conditions here.  Specifically, Scott does not provide any evidence, nor even allege, that he has

been harmed or was in danger of being harmed by an inmate with whom he was double bunked.

Indeed, Scott was not double bunked with any of the inmates with whom he had altercations.

Raymond Affidavit, ¶¶ 8, 10, 12.  Accordingly, this Court recommends that the District Court

grant Defendants' motion on this claim.[13]

c.      <u>Failure To Protect</u>

Scott alleges that Defendants failed to protect him from harm, specifically on the

occasions in which he had physical altercations with Smith, Diaz, and Laronal.  As stated <u>supra</u>,

in order to establish deliberate indifference, a plaintiff must show: "(1) the defendant knew of (2)

a substantial risk (3) of serious harm and (4) disregarded that risk."  <u>Calderon-Ortiz</u>, 300 F.3d at

64.  A defendant cannot be deliberately indifferent "if they reasonably responded to the risk, even

if the harm ultimately was not avoided."  <u>Burrell v. Hampshire County</u>, 307 F.3d 1, 8 (1st Cir.

2002) (citing <u>Farmer</u>, 511 U.S. at 844).  Any inquiry into the reasonableness of the prison

officials' actions "incorporates due regard for prison officials' unenviable task of keeping

dangerous men in safe custody under human conditions."  <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 845).

"The focus is on what the jailers knew and what they did in response."  <u>Id.</u>

A review of the record indicates that Defendants did not disregard a known substantial

risk of harm to Scott; rather, the record shows that Defendants responded reasonably to any

alleged threat to Scott's safety.  For example, neither Smith, Diaz, or Laronal were documented

enemies of Scott, and Scott never informed these Defendants that he had a conflict with these

---

[13]  Scott does not directly address the alleged double bunking policy as part of his motion
for partial summary judgment.  Nevertheless, to the extent that his motion is construed to include
the double bunking claim, this Court recommends its denial.

individuals.[14]  See Scott v. Cote, No. 05-81-P-C, 2006 WL 1030119, at *9 (D. Me. April 18,

2006) (plaintiff inmate's history of confrontation with other inmates too attenuated to put

defendant on notice that there was a risk of attack by inmate who had no history of confrontation

with plaintiff inmate); De Angelis v. Beaudoin, No. 04-456-SM, 2008 WL 205211, at * 7 (D.N.H.

January 22, 2008) (plaintiff's request for protective custody too vague and failed to identify

which inmates posed a potential threat to him or why such threats existed).

        Nor are Scott's expressions of a generalized threat of violence, specifically those made in

his October 1, 2009 letter and his attorney's December 14, 2009 letter, sufficient to create a

genuine issue of material fact that Defendants were deliberately indifferent to Scott's safety or

that Defendants responded unreasonably.  Even assuming that these letters placed Defendants on

notice that Scott was under a generalized threat of danger, the import of these letters are belied by

Scott's own actions.  For example, in his October 1, 2009 letter, Scott stated that although he had

been informed that he would be assaulted if he left SMU for the general population, he would be

incident-free if he were placed in P2.  Defendants then placed Scott in P2 and he was

subsequently assaulted.  In addition, although Scott's attorney stated on December 14, 2009 that

Scott feared for his safety, Scott wrote a letter to officials a week later stating a "grave

misunderstanding" was keeping him in SMU, that he would "gladly go to population" and

requested that he "be sent back to population immediately."  DF 14; Def.'s Ex. 1-J.

        Scott contends that his letters should not be read to exculpate Defendants for their alleged

failure to protect him.  With respect to his October 1, 2009 letter, Scott notes that Diaz–the inmate

--------

        [14]  Scott concedes in his complaint that his September 2009 assailant was "unknown to
him."  AC ¶ 7.

who attacked him in P2–should not have "even been out to attack" him because he was not in Scott's "sector." Pl. Opp., p. 5. Therefore, Scott seems to suggest, he could not have included in his letter any information or warning regarding the potential threat posed by Diaz. Id. As to his December 21, 2009 letter, Scott explains that he requested to go back to population only because he was being held in the more restrictive SMU housing area and because he felt that there were no alternative means to address his safety concerns. Id.

The Court does not find Scott's arguments persuasive. Again, neither Defendants nor Scott knew that Diaz intended to harm Scott. Thus, even if Diaz had been located in the same sector as Scott, the parties would have been equally unable to identify him as a potential assailant. That Diaz attacked Scott during a period in which the two sectors were commingled is immaterial and does not suggest a deliberate indifference on the part of the Defendants. Scott's assertions regarding the unpleasant nature of SMU housing and his resignation to go back to population are similarly unavailing. Indeed, in responding to Scott's request, Defendants placed him in the H2 housing unit, where he had no documented enemies or active conflicts. The Defendants' unsuccessful effort to keep Scott safe while obliging his wishes to leave SMU does not constitute deliberate indifference.

Accordingly, Scott has not created a genuine issue of material fact that Defendants were deliberately indifferent to a substantial risk of harm in violation of the Eighth Amendment, and this Court recommends that the District Court grant Defendants' motion for summary judgment on this claim.[15] Moreover, when viewing the facts in the light most favorable to Defendants,

---

[15] As further grounds for dismissal, Defendants argue that Scott has not provided evidence of a direct "affirmative link" between them and the altercations. Docket No. 34, at 9; see Scott, 2006 WL 1030119 at *9 (granting summary judgment where no link between

Scott cannot satisfy his burden of showing that Defendants were deliberately indifferent as a matter of law.  The Court, therefore, recommends that the District Court deny Scott's motion for partial summary judgment.

      C.      Qualified Immunity

      Defendants argue that they are entitled to qualified immunity.  Docket No. 34, p. 12-15. The qualified immunity doctrine provides public officials an immunity from suit and not a mere defense to liability.  Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009).  A court must perform a two-step analysis in determining qualified immunity.  Id. at 268-9.  A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendants' alleged violation.  Id.  A right is "clearly established" if at the time of the alleged violation, the contours of the right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id. at 269 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  Because the Court has determined that Scott has not established a constitutional violation, the Court does not need to address this defense.  Ruiz-Casillas v.

---

defendant administrator and allegations); see also Adams, 2009 WL 1873584 at *10 (granting summary judgment on failure to supervise claim where no facts supported a finding of constructive or actual notice to supervisors).  In response, Scott argues that at least two of the Defendants had knowledge about his safety issues.  See Pl. Opp., p. 7-11.  For example, Scott's October 1, 2009 letter states that he told Mendonsa of his security concerns, see Def. Ex. 1-F, and the December 14, 2009 letter from Scott's attorney to Dickhaut states that Scott was "extremely fearful for his safety as it relates to that [sic] the other inmates once he leaves the infirmary and is put back into population."  Pl. Ex. C.  There is no evidence of record that Vidal had any knowledge of Scott's safety concerns.  However, even assuming that Scott can raise a genuine issue of fact as to some of the Defendants' knowledge of the risk to his safety, he is nevertheless unable to raise a genuine issue of fact to support a finding that Defendants disregarded that risk, given their actions described above.

Camacho-Morales, 415 F.3d 127, 134 (1st Cir. 2005).

III.    **CONCLUSION**

     For the foregoing reasons, I recommend that the District Court grant Defendants' motion for summary judgment and deny Scott's cross-motion for partial summary judgment.

IV.    **REVIEW BY DISTRICT JUDGE**

     The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hospital,199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir.1993).

                          /s/ Jennifer C. Boal
                          JENNIFER C. BOAL
                          United States Magistrate Judge